CLERK'S COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

99 MAY 18 PM 4:57

*Robert M. March*
CLERK-SANTA FE

| | |
|---|---|
| LINDA JANGULA, and EUGENE JANGULA, | |
| Plaintiffs, | |
| vs. | No. CIV 97-1362 MV/DJS |
| LEAR-SIEGLER, INC.; JOHNSON CONTROLS, INC.; RAYTHEON ENGINEERS & CONSTRUCTORS; DOW CHEMICAL COMPANY; DOWELANCO L.L.C.; BAYER CORPORATION d/b/a Mobay Corporation; and JOHN DOES 1-5, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants Dow Chemical Company, DowElanco L.L.C.'s Motion for Summary Judgment, filed August 13, 1998 **[Doc. 52]**; Bayer Corporation's Motion for Summary Judgment, filed August 21, 1998 **[Doc. 60]**; Lear Siegler Services, Inc.'s Motion for Summary Judgment, filed April 12, 1999 **[Doc. 92]**; Johnson Controls, Inc.'s Motion for Summary Judgment, filed April 20, 1999 **[Doc. 96]**; and Plaintiffs' Motion to Amend Complaint **[Doc. 101]**. The Court previously stayed resolution of Defendants Dow Chemical and Bayer Corporations' motions pending a decision by the New Mexico Supreme Court in the case of *Martinez v. Showa Denko, K.K.*, 125 N.M. 615, , 964 P.2d 176, 181 (Ct. App. 1998) *cert. granted* (August 19, 1998), and permitted supplemental briefing by the parties in light of that opinion. *See* Court's Order of March 11, 1999 **[Doc. 86]**. The Court is now informed that *Martinez* settled before

the New Mexico Supreme Court ruled on the case. Defendants Dow Chemical and Bayer Corporation and Plaintiffs have nevertheless submitted supplemental briefs regarding these motions for summary judgement **[Docs. 91 and 95]**. Because the Court permitted supplemental briefing only for the parties to address how any decision in *Martinez* affected this case, the Court will strike the supplemental briefs filed by all parties **[Docs. 91, 95, 109 and 110]** and rule on the summary judgement motions as originally submitted. The Court, having considered all of the motions, responses, replies, relevant law, and being otherwise fully informed, finds that all five motions are well taken and will be **GRANTED**, as explained below.

## BACKGROUND

Plaintiffs Linda Jangula and Eugene Jangula bring this action against several Defendants seeking damages for personal injuries to Linda Jangula and loss of consortium for Eugene Jangula allegedly caused by Linda Jangula's exposure to pesticides. Defendants Dow Chemical Company ("Dow Chemical"), DowElanco L.L.C. ("DowElanco"), and Bayer Corporation ("Bayer") are the manufacturers of two of the pesticides which allegedly caused Linda Jangula's injuries. Defendant Lear Siegler Services, Inc. ("Lear Siegler") purportedly provided the medical personnel who allegedly failed to properly treat Linda Jangula's injuries. Defendant Johnson controls, Inc. ("Johnson Controls") is the company that applied some of the pesticides. These four Defendants move for summary judgment in their favor arguing that Plaintiffs' claims are barred by the statute of limitations.

A. **Undisputed Facts:**

For the purpose of resolving the summary judgment motions, the Court finds that the following are the undisputed facts:

1. In July 1993, Eugene Jangula, a Lieutenant Colonel in the United States Army, and his wife Linda Jangula, relocated to Riyadh, Saudi Arabia, per orders of the U.S. Army.

2. On August 6, 1993, Linda Jangula was first exposed to pesticides when their military home in the "Palms Compound" was fogged with various pest control products. Among the products used was Dursban, manufactured by Dow Chemical and DowElanco.

3. Linda Jangula immediately experienced a burning throat, shortness of breath, internal chest burning, heart palpitations, nausea, vomiting, numb lips, cold chills and difficulty swallowing. Within three to four days of the exposure, she suffered blistering in her nose, mouth, throat, and eyes, abdominal pain, and muscle spasms. She also experienced extreme abdominal pain and temporary paralysis. Approximately 10-24 days after exposure, she experienced bleeding from her colon and gums, continued abdominal pains, and extreme weakness and fatigue which persisted for about four days.

4. On August 10, four days after exposure, Linda Jangula sought medical treatment at the medical facility on the base. The medical records indicate a possible reaction to insect spray and/or a panic reaction to the fumigation.

5. The health care personnel at the medical facility in Saudi Arabia were provided by Defendant Lear Siegler.

6. On August 30, 1993, the Jangulas requested to be moved from the Palms Compound to the "Camelot Compound" in an effort to avoid "further exposure of possibly harmful chemicals, inadequate mixing, or improper administration."

7. Despite the Jangulas's efforts to avoid exposure, Linda Jangula was again exposed to pesticides on September 12, November 14, December 11, December 21, 1993, and February 1, and March 20, 1994.

8. Each time she was exposed, Linda Jangula experienced similar symptoms including but not limited to burning in her nose and throat, shortness of breath, difficulty swallowing, loss of voice, red and tingly eyes, tightness in the chest, tingling hands, nausea, vomiting and diarrhea. The Jangulas' dog experienced similar symptoms on some of these occasions.

9. Linda Jangula sought medical treatment for her exposure to pesticides on September 12, November 16, December 30, 1993, and January 9, January 26, and May 29, 1994. Each time, she related to the treating physician her belief that the symptoms were caused by the pesticide exposure. The doctors treated her symptoms, diagnosing an allergy to pesticides and/or panic reaction to the spraying.

10. Linda Jangula reports periods in which she was symptom free and believed she had fully recovered from approximately September 24, to November 14, 1993, November 30, to December 11, 1993, and February 10, to March 20, 1994.

11. Linda Jangula also reports that as of January 9, 1994, she noted blood in her stool and "now saw a pattern." On January 26, 1994, she sought medical treatment, describing severe cramps and blood in her stool following eating. She related to the treating physician her belief that these symptoms were caused by her exposure to pesticides and occurred following each exposure.

4

12. On May 1, 1994, Linda Jangula completed an "Exceptional Family Member Program (EFMP) Screening Questionaire." The purpose of the Questionaire is to document the special education and medical needs of military family members to be used in assigning military personnel. On this form, Linda Jangula indicated that she suffered from depression and "asthma, allergies or other respiratory problems," both as a result of pesticide spraying. She also indicated that she experienced blurred vision and muscle and joint pain though she did not identify the cause.

13. On May 10, 1994, Eugene Jangula sent a request for action to the Army Inspector General. In a memorandum attached to the action request dated May 9, 1994, Eugene Jangula stated that "[s]pecific health and safety hazards have been encountered since August 1993 when an over exposure occurred in our family from routine pesticide spraying/fogging at the Palms Compound causing serious chronic medical reactions." Eugene Jangula referred to technical data and articles attached to his memorandum indicating potential health dangers of the pesticides used. Mr. Jangula continued, "[s]ince verbal requests have been unresolved, this memorandum was provided in the hopes of receiving written response to unsettled directives and ongoing health issues." After noting that the Army had moved the family to the Camelot Compound in an unsuccessful effort to avoid further exposures, Mr. Jangula stated "[b]ecause of wife's ultra-sensitivity to these chemical agents, this is not an acceptable solution." Mr. Jangula then condemned the Army's lack of response to "a very serious health matter both personally and for the military community. Our concern is the safety of families living under the direction of our military officials . . . ." Mr. Jangula concluded by stating "[o]ur own health matters are still at large unknown as to the extent of immediate and long term effects. We request your support for ourselves and the community in this urgent matter."

14. In a memorandum to the Army Inspector General dated June 19, 1994, Eugene Jangula detailed the medical treatment which his wife received from Army doctors, concluding, "[w]e do not consider this to be appropriate and complete medical advice, attention and treatment." Mr. Jangula also referred to information which he had received that three of the chemicals used were found to be "too toxic" for use in Europe.

15. On June 30, 1994, the Jangulas left Saudi Arabia and spent three weeks in the United States. While at an airport in Denver, Colorado, Linda Jangula was exposed to pesticides and required medical attention.

16. On July 28, 1994, the Jangulas arrived at Kwajalein, Marshall Islands, after being transferred by the Army.

17. On arrival in their new home, the Jangulas immediately detected the odor of chemicals which "was so strong that Linda knew she may become ill." Linda became nauseous and had little energy. The Jangulas took evasive actions including requesting new quarters and purchasing replacement bedding.

18. The Jangulas' home on the Marshall Islands had been treated with pesticides on March 29, 1994. The pesticides used included Dursban and Tempo 2, manufactured by Defendant Bayer. Linda Jangula was apparently not exposed to Tempo 2 prior to her arrival on the Marshal Islands.

19. Defendant Johnson Controls applied the pesticides to and around the Jangulas' home pursuant to contract with the U.S. Army.

20. Following their detection of pesticides in the home, the Jangulas contacted Johnson Controls, asking what pesticides had been used and informing the company that they need to be advised of future application in order to avoid exposure.

21. On August 7, 1994, Linda Jangula was again exposed to pesticides and again experienced similar symptoms. She did not seek medical treatment. Following the incident, the Jangulas consulted with the pest control company regarding the pesticides used. The company agreed to inform the Jangulas prior to pest control treatments to allow Linda to take evasive actions.

22. On August 18, 1994, Linda Jangula began working and reports "feeling better" but does not describe a cessation of symptoms.

23. On October 8, 1994, Linda Jangula sought medical treatment for Taro Root poisoning. At the time, she advised the doctors that she experienced chemical allergies.

24. On October 27-28, 1994, Linda Jangula was again exposed to pesticides. She and the Jangulas' dog experienced similar symptoms as before.

25. From late October 1994, until July 1, 1995, Linda Jangula continued to be exposed to pesticides and continued to experience similar reactions. In particular, she continued to reside in the home which had been treated with both Dursban and Tempo 2 and continued to experience ill effects which she attributed to the presence of these and other chemicals in the home. She also now found herself having episodic reactions to other household chemicals and petroleum products. She sought medical attention numerous times.

26. Eventually, the Jangulas requested a transfer due to Linda's "chemical sensitivities." The Jangulas returned to the United States on July 1, 1995.

B.  **Additional Facts**

In addition to the foregoing, Plaintiffs assert that Linda Jangula did not know she had been permanently injured by Defendants' products until March 1996, when she was diagnosed by Dr. Mosley as having a permanent neurological injury caused by exposure to chemical pesticides. Mrs. Jangula states in her affidavit that this "permanent illness is the basis" of her claim against Defendants.

However, Plaintiffs provide only Linda Jangula's own affidavit as proof of the diagnosis. Defendants, on the other hand, provide two letters by Dr. Mosley indicating that he never gave Linda Jangula such a diagnosis. In his first letter, dated March 22, 1996, Dr. Mosley recommended a nerve conduction study for Mrs. Jangula but observed that "a neurological deficit was not demonstrated on neuro examination. Of note, the patient's neurological exam was entirely within normal limits." In his second letter dated August 3, 1996, Dr. Mosely told Mrs. Jangula that neurobehavior testing "showed mild abnormalities in memory, attention and concentration which may have been related to the initial exposure."

Because Plaintiffs have failed to present any evidence other than Mrs. Jangula's self-serving affidavit tending to demonstrate that Dr. Mosely did in fact give Mrs. Jangula a diagnosis of permanent neurological injury, the Court concludes that Plaintiffs have failed to establish the existence of a genuine dispute on this material fact. Accordingly, the Court accepts as undisputed that Dr. Mosely's exams indicated neurological functioning within normal ranges in March 1996, and demonstrated mild abnormalities by August 1996.

In response to the motions of Defendants Lear Siegler and Johnson Controls, Plaintiffs also provide the affidavit and report of Dr. Raymond Singer. Dr. Singer indicates that he has diagnosed

8

Mrs. Jangula with "brain dysfunction" and "multiple chemical sensitivity." However, Dr. Singer examined Mrs. Jangula in June of 1998, after the present Complaint was filed.

## STANDARD OF REVIEW

### A. Summary Judgment

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590

F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

### B. Motion to Amend Complaint

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." "The decision to grant leave to amend a complaint, after the permissive period, is within the trial court's discretion." *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991).

## ANALYSIS

### A. Summary Judgment Motions

Defendants contend that summary judgment in their favor is mandated because Plaintiffs failed to file their Complaint within the statute of limitations period. All parties agree that this action is governed by the New Mexico Statute of Limitations which requires that actions for personal injury be filed within three years of accrual. NMSA 1978, § 37-1-8 (Repl. Pamp. 1990). Plaintiffs filed their First Complaint, naming Johnson Controls on October 22, 1997. Plaintiffs served the other Defendants with the First Amended Complaint, on November 19, 1997. Thus, if Plaintiffs' claims accrued prior to October 22, 1994, they are barred against all Defendants as a result of the statute of limitations.

The undisputed facts demonstrate that Linda Jangula was first exposed to Dursban on August 6, 1993. She experienced an immediate reaction, immediately attributed her reaction to the pesticides and sought medical treatment shortly after. She continued to be re-exposed to the pesticide periodically from August, 1993, to July, 1995. Similarly, the undisputed facts demonstrate that Mrs. Jangula was first exposed to Tempo 2 on July 28, 1994. She again experienced an immediate reaction and attributed her reaction to the pesticides. She also continued to be re-exposed to this pesticide from July, 1994, to July 1995. Plaintiffs assert however that it was not until March 1996, that Linda Jangula realized that she had sustained permanent injuries. Accordingly, Plaintiffs argue that the statute of limitations was tolled until that time. The question currently before the Court is whether Mrs. Jangula's cause of action accrued before October 22, 1994, at or soon after exposure, or whether the statute of limitations was tolled until Mrs. Jangula "discovered" the "permanent" nature of her injuries.

The established rule in New Mexico has been that the statute of limitations for personal injury begins to run "when an injury manifests itself and is ascertainable rather than when the wrongful or negligent act occurs." *Bolden v. Village of Corrales*, 111 N.M. 721, 722, 809 P.2d 635, 636 (Ct.App.), cert. denied, 111 N.M. 77, 801 P.2d 659 (1990) (citing *Long v. Weaver*, 105 N.M. 188, 191, 730 P.2d 491, 494 (Ct.App.1986)). In *Bolden*, the plaintiff had fallen immediately injuring her ankle, though the extent of the injury was not known until the next day when the ankle was operated on. The plaintiff filed suit two years to the day of the surgery, one day past the two year anniversary of the injury. The Court of Appeals held that the plaintiff's claims were bared by the two year statute of limitations for tort suits against government agencies because the claims accrued on the day of the accident, stating, "[a]t that time, it was certain that plaintiff had suffered an injury as

11

a consequence of the alleged wrongful act of another for which the law affords a remedy." *Id.* at 722. The court stated,

> [t]he fact that the full extent of the injury was not known does not affect the running of the statute of limitations. To so hold would defeat the purpose of the statute of limitations. It is not required that all the damages resulting from the negligent act be known before the statute of limitations begins to run. Once plaintiff suffers loss or injury, the statute begins to run.

*Id.*; *see also Robbins v. United States*, 624 F.2d 971, 973 (10th Cir. 1980) ("this Court has recognized that a legally cognizable injury or damage begins the running of the statutory period ... even though the ultimate damage is unknown or unpredictable. ... In the instant case, Robbins was well aware of the injury and its cause shortly after it occurred. That he might have then believed the injury was only temporary is irrelevant." Applying Federal Tort Claims Act); *Lopez v. United States*, 998 F.Supp. 1239, 1243 (D.N.M. 1998) (same holding, applying Federal Tort Claims Act).

In New Mexico, under certain circumstances, the running of statute of limitations may be tolled by the "discovery rule" which provides that a cause of action for personal injury does not accrue until the plaintiff knew or should have known of both the injury and the cause. *Roberts v. Southwest Community Health Services*, 114 N.M. 248, 256 (1992) (discovery rule applies to medical malpractice claims); *see also Sawtell v. E.I. Du Pont De Nemours and Co., Inc.* 22 F.3d 248, 251-252 (10th Cir. 1994) (predicting that New Mexico will extend discovery rule to products liability cases). In a recent case, the New Mexico Court of Appeals held that the discovery rule does in fact apply to cases of product liability such as the case at bar. *Martinez v. Showa Denko, K.K.*, 125 N.M. 615, , 964 P.2d 176, 181 (Ct. App. 1998). *Martinez* involves claims of personal injury from plaintiff's use of a diet supplement. Despite agreeing that the discovery rule applied to such cases, the Court of Appeals in *Martinez* held that the plaintiff's claims were nevertheless barred because

12

the plaintiff had recognized symptoms which she attributed to the diet supplement prior to the statute of limitations cut-off, even though she had conflicting diagnoses and did not know the full extent of her injuries. *Id.* at 181.

Likewise, in *Martinez-Sandoval v. Kirsch*, 118 N.M. 616 (Ct. App. 1994), the Court of Appeals held that the discovery rule provided no assistance to the plaintiff in avoiding the statute of limitations. The plaintiff in *Martinez-Sandoval* brought suit against a priest for sexual abuse alleged to have occurred from 1973 to 1977. *Id.* at 618. The question before the court was whether the plaintiff's cause of action accrued prior to August 1988, one year after the plaintiff reached the age of majority. The plaintiff argued that her cause of action did not accrue until 1991 when, in the course of psychotherapy, she discovered that she suffered from severe psychological problems caused by the defendant's conduct. *Id.* at 618. Although the court did not actually adopt the discovery rule at that time, the court stated, "we assume that the cause of action does not accrue until the plaintiff knows or should reasonably have discovered that she has suffered appreciable harm from the defendant's misconduct." *Id.* at 622. In the case before it, the court concluded that "pain and discomfort" which the plaintiff experienced during sexual relations with the defendant and the fact that she found the relationship "distasteful and overwhelming" were insufficient harms to trigger the running of the statute of limitations. *Id.* However, the court held that when the plaintiff contracted a venereal disease from the defendant and became pregnant, leading to an abortion, she had sustained "sufficiently substantial injuries that once she knew that they were caused by [the defendant], the limitations period would no longer be delayed by the discovery rule." *Id.* The court concluded,

> [t]hus, regardless of whether Plaintiff knew or should have known of the severe psychological damage caused by [defendant's] alleged misconduct, Plaintiff knew and should have known well before the limitations cutoff date that the alleged

13

misconduct had caused her other substantial injury. The limitations period is not tolled simply because a plaintiff does not know the full extent of her injury; the statute begins to run once she knows or should know sufficient facts to constitute a cause of action.

*Id.* (citations omitted); *see also LaMure v. Peters*, 122 N.M. 367, 370-71 (Ct. App. 1996) (under discovery rule, statute begins to run when "there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred.").

The *Martinez-Sandoval* court went on to consider whether plaintiffs' claims could be salvaged by "separating" the defendant's later misconduct from that which caused plaintiff's venereal disease and abortion. *Id.* at 623. The court rejected this possibility, concluding that the plaintiff treated the defendant's misconduct "as a continuing tort, forming the predicate of one indivisible cause of action." Further, the court observed that this "approach accords with the general rule that when a series of actions by a defendant cause one indivisible harm, Plaintiff has only one indivisible cause of action." *Id.* (citations omitted); *see also Oeffler v. Miles, Inc.*, 241 A.D.2d 822, 825-26 (Ct App. NY 1997) (plaintiff failed to establish new and distinct injury caused by long term exposure to pesticides where injury began to manifest prior to statute of limitations cut-off even though exposure continued); *LaMure*, 122 N.M. at 372 (statute began to run when plaintiffs knew they were injured even if injury continued).

Similarly, applying the discovery rule to a claim of pesticide poisoning, the Oklahoma Supreme Court held that the plaintiff's claims were nevertheless barred by the statute of limitations were "[t]he toxicity potential was known and connected to plaintiff's maladies soon after exposure," even though the diagnosis was not definitive and the extent of injury was unknown. *Daugherty v.*

*Farmers Cooperative Assoc.*, 689 P.2d 947, 950 (1984); *see also Whitney v. Agway Inc.*, 238 A.D.2d 782, 783-84 (Ct. App. NY 1997) (claim barred by statute of limitations where plaintiff aware of symptoms and associated symptoms with pesticides even though plaintiff did not know full extent of injury or definitive diagnosis); *M.T. O'Nan v. Velisocol Chemical Corp. and B & G*, 1998 WL 774131 (Ct. App. Tex. 1998) (unpublished opinion holding statute of limitations barred claim regarding injuries from pesticides where plaintiff knew of symptoms and possible connection to pesticides even though plaintiff thought her family was experiencing an allergic reaction and did not know of permanent injury); *Boyd v. Orkin Exterminating Co., Inc.*, 191 Ga.App.38, 41 (1989) (claim barred where plaintiffs knew prior to statute of limitations cut-off that they were experiencing adverse physical reaction to pesticides even if extent of injury unknown).

In the present case, Plaintiffs assert that Linda Jangula did not know she was permanently injured until Dr. Mosely's diagnosis in March 1996, and that the statute of limitations therefore did not begin to run until that time. As noted above, Plaintiffs have failed to produce competent evidence of the March 1996, diagnosis while Defendants have demonstrated that Dr. Mosely reported normal neurological functioning at that time and only "mild abnormalities" in his August 1996, letter. Moreover, the undisputed facts demonstrate that Plaintiffs' had concluded at least by May 9, 1994, that Linda Jangula suffered chronic ill effects from pesticide poisoning. The most compelling evidence on this point is Eugene Jangula's memorandum to the Army Inspector General, in which he asserted that the initial pesticide exposure on August 6, 1993, caused his wife to experience "serious chronic medical reactions." Thus, the undisputed facts demonstrate that by May 9, 1994, the Jangulas knew that Linda had "suffered an appreciable harm" as a result of her exposure to pesticides. *Martinez-Sandoval*, 118 N.M. at 622. Further, as of June 19, 1994, the Jangulas had

15

concluded that the medical treatment Mrs. Jangula received from Defendant Lear Siegler's staff was "inappropriate."

Even under the most generous reading of New Mexico law, the statute of limitations began to run in this case as soon as Linda Jangula knew she had sustained a substantial injury and knew that Defendants' conduct was the source of her injury. *Martinez-Sandoval*, 118 N.M. at 622. Plaintiffs knew at least by May 9, 1994, that Linda Jangula had experienced "serious chronic medical reactions" as a result of exposure to Defendant Dow Chemical and DowElanco's product Dursban and other pesticides, and knew by June 19, 1994, that Defendant Lear Siegler's staff had failed to properly treat these conditions. Therefore, regardless of any diagnosis Mrs. Jangula later received, the statute of limitations for these injuries began to run at least by May 9, 1994, and June 19, 1994, respectively, or approximately six months prior to the October 22, 1994, cut-off for calculating the statute of limitations period in this case. *Martinez*, 964 P.2d at 181; *Martinez-Sandoval*, 118 N.M. at 622; *LaMure*, 122 N.M. at 372; *Bolden*, 111 N.M. 721.

However, Linda Jangula was not exposed to Defendant Bayer's product Tempo 2, which was applied by Defendant Johnson Controls, until she reached the Marshal Islands on July 28, 1994. By this time, Mrs. Jangula had already been injured by pesticide exposure and was already concerned about additional exposures. On entering her new home, she immediately experienced ill effects which she attributed to the presence of the pesticides. Very shortly after, the Jangulas determined the kinds of pesticides which had been used and engaged in discussions with Johnson Controls regarding their application of the pesticides. Again, although she may not have known the extent of her injury at that time, Linda Jangula knew she had been injured by this additional exposure to pesticides, including Bayer's product Tempo 2 which Johnson Controls had applied. Thus, Plaintiffs'

16

claims against Defendants Bayer and Johnson Controls also accrued at some point prior to October 22, 1994. *Martinez*, 964 P.2d at 181; *Martinez-Sandoval*, 118 N.M. at 622.

Although Plaintiffs do not address this issue, the facts also demonstrate that Mrs. Jangula continued to be exposed to both Tempo 2 and Dursban throughout the remainder of 1994 and the first half of 1995. Therefore, plaintiffs' claims might not be time-barred if, under New Mexico law, her cause of action continued to accrue with the continuing harm. However, as in *Martinez-Sandoval* discussed above, Plaintiffs here treat Defendants' actions "as a continuing tort, forming the predicate of one indivisible cause of action." *Martinez-Sandoval*, 118 N.M. at 622. Plaintiffs have not pled, argued or proven that Linda Jangula incurred additional and distinct injuries due to the continued exposure but rather, as in *Martinez-Sandoval*, argue that the cumulative effect of the exposure, beginning with the initial incident in August of 1993, caused her injuries. Under New Mexico law, "when a series of actions by a defendant cause one indivisible harm, Plaintiff has only one indivisible cause of action." *Id.*; *LaMure*, 122 N.M. at 372. Only one indivisible harm is asserted here. Thus, Plaintiffs' cause of action began to accrue as soon as Plaintiffs were aware of a substantial injury caused by Defendants' conduct. *Martinez-Sandoval*, 118 N.M. at 622; *LaMure*, 122 N.M. at 372. For all Defendants, Dow Chemical, DowElanco, Bayer, Lear Siegler and Johnson Controls, Plaintiffs knew that their products and actions had caused Linda Jangula serious and potentially long term injury prior to October 22, 1994, even if they did not know the full extent of the injury or formal diagnosis. Thus, Plaintiff's claims against all of these Defendants are time-barred. *Martinez-Sandoval*, 118 N.M. at 622.

B.  **Motion to Amend Complaint**

Finally, Plaintiffs request leave to amend their Complaint to add claims of breach of contract against three Defendants, Lear-Siegler, Johnson Controls and Raytheon Engineers and Constructors.

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." "The decision to grant leave to amend a complaint, after the permissive period, is within the trial court's discretion." *Woolsey v. Marion Laboratories, Inc.*, 934 F.2d 1452, 1462 (10th Cir. 1991).

Defendant Raytheon Engineers has already reached a settlement with Plaintiffs and has already been dismissed from this case. Accordingly, the Court finds that the proposed amendment as to this Defendant is untimely and would cause undue prejudice.

Regarding the remaining two Defendants, Lear Siegler and Johnson Controls, the Court finds that the amendment is not untimely and should be permitted in the interest of justice. Specifically, discovery in this case has been stayed since October 5, 1998, and was only just reopened on May 7, 1999. Thus, despite the fact that this Complaint has been pending for sometime, the parties are still in the preliminary stages of discovery. Further, the proposed amendment does not substantially change the nature of the case. Therefore, the Court finds that Defendants Lear Siegler and Johnson Controls will not be prejudiced by the proposed amendment. The Court further finds that in the interest of justice, Plaintiffs should be permitted to pursue these claims against Defendants.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants Dow Chemical Company, DowElanco L.L.C., Bayer Corporation, Lear Siegler and Johnson Controls' Motions for Summary Judgment

[Doc. 52, 60, 92 and 96] are hereby **GRANTED**. It is further ordered that Plaintiffs' Motion to Amend the Complaint [Doc. 101] is hereby **GRANTED**. Plaintiffs are hereby granted leave to file an amended complaint adding breach of contract claims against Defendants Lear Siegler and Johnson Controls. All claims against Defendants Dow Chemical Company, DowElanco L.L.C., and Bayer Corporation are hereby **DISMISSED WITH PREJUDICE**. All tort claims against Defendants Lear Siegler and Johnson Controls are also hereby **DISMISSED WITH PREJUDICE**.

_____
MARTHA VÁZQUEZ
DISTRICT COURT JUDGE

Attorneys for Plaintiffs:
Kathleen Carter
Joanne Holland

Attorneys for Defendants:
Andrew Detherage
Douglas Baker
James Moore
Briggs Cheney